RECEIVED
IN LAKE CHARLES, LA
FEB 1 3 2014
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | DOCKET NO. 2:13CR00057-001 |
| VS. | : | JUDGE MINALDI |
| ANTHOWN LATARIUS SWAN | : | MAGISTRATE JUDGE KAY |

## MEMORANDUM RULING

Presently before the court are the defendant's and the Government's objections to the Presentence Report ("PSR") prepared by the Probation Department.

In the Government's first objection, the AUSA submitted facts to supplement the facts stated in the PSR. This does not require a ruling by the court.

In the second objection, the Government argues that there should be a two point increase pursuant to USSG §2B1.1(b)(11) for the use of an authentication feature. The defendant opposes this.

A counterfeit Texas driver's license was found in the room occupied by the co-defendants and it was found next to a counterfeit check produced in the same manner as others previously cashed. The Government states that the license was made by Kittelberger and had his picture on it. The Government asserts that even if Swan did not actively participate in making the fake license, Swan is still responsible for his actions as a coconspirator.

Swan was acquitted of aggravated identity theft. The Government reasons that this is because the jury did not find proof beyond a reasonable doubt. The Supreme Court in *United States v. Watts*,

519 U.S. 148, 156-157 (1997) held that a jury's verdict of acquittal does not prevent the sentencing court from considering the underlying acquitted charge, so long as the evidence has been proved by a preponderance of the evidence. The defendant argues that if the court applies a lesser burden of proof when considering relevant conduct at sentencing, the Court would, in essence, be analyzing the defendant's conduct under "elements of proof that are distinct from those in the jury instructions." Addenum to PSR, p. 5. This is true, but it is well-established that the burden of proof at sentencing is different from that at trial.

The Government argues that because the forged license was found in the same room where Swan, Kittelberger, Cunningham, and Washington stayed during the conspiracy, and was found next to a counterfeit check, the court should assume that the check that Kittelberger attempted to cash with the counterfeit license was made using the same computer, printer, check stock, and check creating program that the conspirators used to commit bank fraud. There has been no evidence introduced, however, to prove that the license was made on the same computer. The Government further posits that it was reasonably foreseeable that a co-conspirator would engage in counterfeiting a license to attempt to facilitate cashing the counterfeited checks. But, the court is not persuaded as these conspirators were recruiting homeless people with identification to cash the checks for them.

The Government argues that Swan's offense involved the "use" of an authentication feature when the driver's license was used to induce the bank to cash the forged checks. *U.S. v. Baker*, 435 Fed.App'x. 2, 4, 2011 WL 2118347, 2 (C.A.D.C., 2011).

§ 2B1.1(b)(11) of the Guidelines instructs a district court to increase a defendant's offense

level by two levels[1] if the offense involved:

> (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature; or (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of [five] or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification.

The statute defines an "authentication feature" [as] "any hologram ... or *other feature that ... is used by the issuing authority on an identification document* ... to determine if the document is counterfeit,"[2] (emphasis added) 18 U.S.C. § 1028(d)(1); *see* U.S.S.G. § 2B1.1, app. n. 9(A) (2009) (incorporating § 1028(d)(1)'s definition). In the instant case, a Texas driver's license was found in

---

[1] To avoid impermissible double counting of relevant conduct, however, §2B1.6 of the Guidelines—the Guideline section applicable to convictions for aggravated identity theft under §1028A—limits the application of U.S.S.G. § 2B1.1(b)(11). Specifically, the commentary instructs that, if a sentence under the Guideline is imposed "in conjunction with" a sentence for the underlying fraud offense, the specific offense characteristics for "the transfer, possession, or use of a means of identification" are inapplicable. U.S.S.G. § 2B1.6 cmt. n. 2.
Under 18 U.S.C. § 1028A(a)(1), a two-year prison sentence is required for the knowing "transfer[ ], possess[ion], or use [ ], without lawful authority" of a "means of identification of another person" during and in relation to certain underlying offenses. Although the exclusion language in Application Note 2 "tracks the language that triggers [§ 1028A]' s consecutive term of imprisonment, ... [U.S.S.G.] § 2B1.6 does not exclude all conduct described in" U.S.S.G. § 2B1.1(b)(11). *United States v. Jenkins–Watts,* 574 F.3d 950, 962 (8th Cir.2009).

[2] In the Guidelines the term "authentication feature" has the same definition as found in 18 U.S.C. 1028(D)(1):

> the term "authentication feature" means any hologram, watermark, certification, symbol, code, image, sequence of numbers or letter, or other feature that either individually or in combination with another feature is used by te issuing authority on an identification document, document-making implement, or means of identification to determine if the document is counterfeit, altered, or otherwise falsified.

3

the Staybridge Suites. Texas driver's licenses are issued by an "issuing authority"[3], the State of Texas. The Government argues that the license and the license number are used by the State of Texas as a means of identifying individuals.[4]

This Court, like our sister court in *United States v. Rodriguez-Cisneros,* 916 F.Supp.2d 932, 934 -935 (D.Neb.,2013) questions the applicability of the enhancement based on the facts currently presented—the Court is not persuaded that a driver's license number, standing alone, is an "authentication feature" within the meaning of the relevant statutory and Guidelines provisions. The Court accepts that a driver's licence is an "identification document" and the definition of "authentication feature" includes a "sequence of numbers or letters." But the Court is not convinced that a driver's license number is "used by the issuing authority ... to determine if the document is counterfeit, altered, or otherwise falsified[.]"

The source of the statutory definition is the SAFE ID Act of 2003, Pub. L. No. 108–21, § 607, 117 Stat. 650, 689–91 (2003), and the conference report for that legislation explains its purpose:

---

[3] The term "issuing authority" is defined as (A) any government entity or agency that is authorized to issue identification documents, means of identification, or authentication features; and (B) includes the United States Government, a State, a political subdivision of a State, a sponsoring entity of an event designated by the President as a special event of national significance, a foreign government, political subdivision of a foreign government, or an international government or quasi-governmental organization. 18 U.S.C 1028.

[4] The defendant agrees that the Texas driver's license bearing the authentic driver's license number of Christopher Miller is a means of identification bearing an authentic feature used by an issuing authority, however the defendant argues that the "pertinence of these parts of the guidelines aside, the Government's arguments belie the obvious intent of USSG 2B1.1(b)(1)), which considered *in toto* demonstrates applicability in cases of persons in possession of or producing 'devices' used to create fraudulent 'means of identification' or 'unauthorized access cards' through the use of 'authentication features.'" (Addendum to PSR, pp. 6-7).

4

> Under current law, it is not illegal to possess, traffic in, or use false or misleading authentication features whose purpose is to create fraudulent IDs. [This section] would correct this oversight by making it a crime to counterfeit or alter "authentication features," as well as to traffic such features in false identification documents or without the authorization of the appropriate authority. *Authentication features are the holograms, symbols, codes, etc., used by the issuing authority to verify that an ID is authentic.* In addition, this section requires forfeiture of equipment used in creating or trafficking in illicit authentication features. This section will help the fight against child abduction, terrorism, identity theft, and underage drinking, among other things, by addressing the growing trade in illicit authentication feature for Ids.

H. Conf. Rep. No. 108–66, at 67 (2003), [2003 U.S.C.C.A.N. 683, 702] (emphasis supplied).

The obvious purpose of the legislation—both from its history and its plain language—was to address anti-counterfeiting measures. *See e.g. United States v. Elmardoudi,* 611 F.Supp.2d 879, 897 (N.D.Iowa 2008). A driver's license number, by contrast, is clearly a "means of identification" as defined by the statute: a "name or number that may be used, alone or in conjunction with any other information, to identify a specific individual," including a Social Security number or driver's license number. § 1028(d)(7). The purpose of a driver's license number is identification, not security. The two categories are not necessarily mutually exclusive, but the distinction is helpful. Any "means of identification" could presumably be used to detect deception, because it could be used to discover that the person presenting the identifying document is not actually the person identified. The fact that Congress drew a distinction between a "means of identification" and a "authentication feature" suggests that the latter should be a feature primarily used for security. *Rodriguez-Cisneros,* 916 F.Supp.2d at 935.

While the starting point for interpreting a statute is the language of the statute itself, a court engaging in statutory construction must interpret the words of the statute in light of the purposes

Congress sought to serve. *Westerfeld v. Indep. Processing, LLC,* 621 F.3d 819, 824 (8th Cir.2010). In ascertaining the plain meaning of the statute, a court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole. *United States v. I.L.,* 614 F.3d 817, 820 (8th Cir.2010). When the context and purpose of § 1028 are considered, it is evident that the primary function of an "authentication feature" within the meaning of § 1028(d)(1) should be its use by the issuing authority to determine if an identification document is counterfeit, altered, or otherwise falsified. That is not a driver's license number's primary function. *United States v. Rodriguez-Cisneros,* 916 F.Supp.2d 932, 934 -935 (D.Neb., 2013).

The Court will consider the evidence presented at sentencing, and the arguments of counsel. But in the absence of additional evidence, for the reasons stated above, the Court's *tentative* finding is that the § 2B1.1(b)(11)(A)(ii) enhancement is not applicable in this case.

The defendant also filed factual objections which do not require a ruling by the court.

The last objection filed by the defendant argues that a two point increase for Swan's role in the offense should not be applied. Swan states that there is no evidence to suggest that he organized, led, managed or supervised his co-conspirators. Application note 4 to section 3B1.1(b) lists a number of factors that tend to support a finding of manager status, including the defendant's participation in planning, recruitment of accomplices, and exercise of control and authority over others. *U.S. v. Reagan,* 725 F.3d 471, 494 (5th Cir. 2013). The evidence established that Swan, Cunningham, Washington and Kittleberger were the primary conspirators in this case. They stole the original checks, secured the equipment necessary to produce the counterfeit checks, and then they recruited men with identification from the homeless shelter to cash the checks for a fee.

Cunningham and Washington were the recruiters.  Swan rented the hotel room for the conspirators, was involved in printing the checks and determining the amount of the checks.  He also enjoyed a larger portion of the proceeds than those merely cashing the checks.  The facts of this case support this enhancement.  The Defendant's objection is OVERRULED.

Lake Charles, Louisiana, this 12 day of February, 2014.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

7